[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10275
_____

OSHC-0:11-0646

COMTRAN GROUP, INC.,

Petitioner,

versus

U.S. DEPARTMENT OF LABOR,

Respondent.
_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
_____

(July 24, 2013)

Before MARTIN and ANDERSON, Circuit Judges, and VINSON,[*] District Judge.

VINSON, District Judge:

ComTran Group, Inc. ("ComTran"), petitions for review of a final decision

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

of the Occupational Safety and Health Review Commission ("Commission"). The Commission held that ComTran violated standards under the Occupational Safety and Health Act ("OSHA" or the "Act"), 29 U.S.C. §§ 651 et seq., when one of its supervisors was caught digging in a six-feet deep trench with an unprotected five-feet high "spoil pile" at the edge of the excavation. This appeal presents an issue of first impression in our circuit: Is it appropriate to impute a supervisor's knowledge of his own violative conduct to his employer under the Act, thereby relieving the Secretary of Labor ("Secretary") of her burden to prove the "knowledge" element of her prima facie case? Upon close review of the record, briefs, and case law from other circuits, and with the benefit of oral argument, we answer that question in the negative. Therefore, we grant the petition, reverse the Commission's decision, and remand this case for further consideration.

## I. BACKGROUND

Before turning to the facts and administrative history of this case, it will be useful to describe the statutory and regulatory scheme that provides the backdrop for this appeal.

### A. The Statutory and Regulatory Scheme

Passed by Congress in 1970, OSHA sought to assure that "'every working man and woman in the Nation [had] safe and healthful working conditions.'" See Reich v. Trinity Indus., Inc., 16 F.3d 1149, 1151 (11th Cir. 1994) (quoting 29

2

U.S.C. § 651(b)). The Act "granted employees a new set of important rights and [intended] that they play a vital role in achieving safe and healthful conditions at the workplace." Marshall v. Daniel Constr. Co., Inc., 563 F.2d 707, 711-12 (5th Cir. 1977).[1] It has been long-established that OSHA does not impose absolute (or strict) liability on employers for harmful workplace conditions; instead, it focuses liability where harm can, in fact, be prevented. See, e.g., Central of Ga. R.R. Co. v. Occupational Safety & Health Review Comm'n, 576 F.2d 620, 623 (5th Cir. 1978) (collecting cases); Brennan v. Occupational Safety & Health Review Comm'n, 502 F.2d 946, 951 (3d Cir. 1974); see also Brennan v. Occupational Safety & Health Review Comm'n, 511 F.2d 1139, 1145 (9th Cir. 1975) (noting that there must be "some nexus between the employer and the alleged violation", otherwise employers would be "strictly and absolutely liable for all violations" contrary to what Congress intended). Thus, while courts have emphasized the importance of proper instruction and adequate supervision in safety-related matters, "they have consistently refused to require measures beyond those which are reasonable and feasible." See Horne Plumbing & Heating Co. v. Occupational Safety & Health Review Comm'n, 528 F.2d 564, 569 (5th Cir. 1976) (discussing cases).

To implement its statutory purpose, Congress imposed dual obligations on

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all Fifth Circuit decisions that were rendered before October 1, 1981. Id. at 1209.

employers. They must first comply with the "general duty" to free the workplace of all recognized hazards. 29 U.S.C. § 654(a)(1). They also have a "special duty" to comply with all mandatory health and safety standards. Id. at § 654(a)(2). With respect to the latter, Congress provided for the promulgation and enforcement of the mandatory standards through a regulatory scheme that divides responsibilities between two federal agencies. See generally New York State Elec. & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 103-04 (2d Cir. 1996) (discussing the regulatory scheme). The Secretary has rulemaking power and establishes the safety standards; investigates the employers to ensure compliance; and issues citations and assesses monetary penalties for violations. See id. at 103 (citing 29 U.S.C. §§ 655 and 657-59). The Commission, meanwhile, has adjudicative power and serves as a "neutral arbiter" between the Secretary and cited employers. Id. (quoting Cuyahoga Valley Ry. Co. v. United Transp. Union, 474 U.S. 3, 7, 106 S. Ct. 286, 288 (1985)).

An employer contesting a citation is entitled to an evidentiary hearing before an Administrative Law Judge ("ALJ"), at which the Secretary bears the burden of proof. See 29 U.S.C. § 659(c); Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 446, 97 S. Ct. 1261, 1264 (1977). The ALJ will make findings of fact and conclusions of law, and issue an order affirming, modifying, or vacating the citation. See New York State Elec. & Gas Corp., 88 F.3d at 103 (citing 29 U.S.C. § 659(c)). The ALJ will consider the amount of the

4

Secretary's penalty de novo. See 29 U.S.C. § 666(j). The ALJ's order becomes a final decision of the Commission 30 days thereafter, unless the party affected or aggrieved by the decision petitions the Commission for discretionary review, 29 C.F.R. § 2200.91, and a Commission member requests that the case be reviewed by the full Commission. See 29 U.S.C. § 661(j).

Appeals from final decisions of the Commission are reviewed directly by the Courts of Appeals. See 29 U.S.C. § 660(a). On review, the Commission's findings of fact must be upheld if they are "'supported by substantial evidence on the record considered as a whole[.]'" Fluor Daniel v. Occupational Safety & Health Review Comm'n, 295 F.3d 1232, 1236 (11th Cir. 2002) (quoting 29 U.S.C. § 660(a)). The conclusions of law, meanwhile, must be upheld as long as they are not "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" See id. (quoting 5 U.S.C. § 706(2)(A)). The Commission and its ALJs are bound to follow the law of the circuit to which the case would most likely be appealed. See, e.g., Secretary of Labor v. Interstate Brands Corp., 20 O.S.H. Cas. (BNA) 1102, at *2 n.7 (2003).

Under the law of our circuit, the Secretary will make out a prima facie case for the violation of an OSHA standard by showing (1) that the regulation applied; (2) that it was violated; (3) that an employee was exposed to the hazard that was created; and importantly, 4) that the employer "knowingly disregarded" the Act's

5

requirements. See Reich, 16 F.3d at 1155 (citing Cleveland Consolidated, Inc. v. Occupational Safety & Health Review Comm'n, 649 F.2d 1160, 1165 (5th Cir. Unit B July 9, 1981)). As for the knowledge element (the one at issue in this case), the Secretary can prove employer knowledge of the violation in one of two ways. First, where the Secretary shows that a supervisor had either actual or constructive knowledge of the violation, such knowledge is generally imputed to the employer. See Georgia Elec. Co. v. Marshall, 595 F.2d 309, 321 (5th Cir. 1979); New York State Elec. & Gas Corp., 88 F.3d at 105; see also Secretary of Labor v. Access Equip. Sys., Inc., 18 O.S.H. Cas. (BNA) 1718, at *9 (1999).[2] An example of actual knowledge is where a supervisor directly sees a subordinate's misconduct. See, e.g., Secretary of Labor v. Kansas Power & Light Co., 5 O.S.H. Cas. (BNA) 1202, at *3 (1977) (holding that because the supervisor directly saw the violative conduct without stating any objection, "his knowledge and approval of the work methods employed will be imputed to respondent"). An example of constructive knowledge is where the supervisor may not have directly seen the subordinate's misconduct, but he was in close enough proximity that he should have. See, e.g., Secretary of Labor v. Hamilton Fixture, 16 O.S.H. Cas. (BNA) 1073, at *17-19 (1993) (holding

---

[2] We say that a supervisor's knowledge is "generally imputed to the employer" because that is the outcome in the ordinary case. The "ordinary case," however, is where the supervisor knew or should have known that subordinate employees were engaged in misconduct, and not, as here, where the supervisor is the actual malfeasant who acts contrary to the law. See W.G. Yates & Sons Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n, 459 F.3d 604, 609 n.7 (5th Cir. 2006) (noting same). As will be seen, that important factual distinction is ultimately what this case is all about.

that constructive knowledge was shown where the supervisor, who had just walked into the work area, was 10 feet away from the violative conduct). In the alternative, the Secretary can show knowledge based upon the employer's failure to implement an adequate safety program, see New York State Elec. & Gas Corp., 88 F.3d at 105-06 (citations omitted), with the rationale being that --- in the absence of such a program --- the misconduct was reasonably foreseeable.

If (and only if) the Secretary makes out her prima facie case with respect to all four elements, the employer may then come forward and assert the affirmative defense of unpreventable or unforeseeable employee misconduct. See New York State Elec. & Gas Corp., 88 F.3d at 106-08 (discussing this defense and noting that "[t]he Secretary must first make out a prima facie case before the affirmative defense comes into play"). This defense requires the employer to show that it: (1) created a work rule to prevent the violation at issue; (2) adequately communicated that rule to its employees; (3) took all reasonable steps to discover noncompliance; and (4) enforced the rule against employees when violations were discovered. See id. at 106 (citations omitted).[3]

With the foregoing in mind, we will now turn to the facts and background of

_____

[3] The Secretary's alternative method to show employer knowledge and the unforeseeable employee misconduct affirmative defense "involve an identical issue: whether the employer had an adequate safety policy." New York State Elec. & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 106 (2d Cir. 1996). This does not lessen the Secretary's prima facie burden, however. See id. at 107 (stating "the fact that the employer might litigate a similar or even an identical issue as an affirmative defense does not logically remove an element from the complainant's case").

7

this particular case.

**B. The Underlying Incident and Citations**

ComTran is a communications utilities company located in Buford, Georgia. It has approximately 50 employees and performs indoor and outdoor utilities work that sometimes requires underground construction at a shallow depth, generally not more than three to four feet.[4] Its work normally involves directional drilling instead of digging. In 2010, Gwinnett County hired ComTran for a small, two-day project that consisted of relocating some existing Department of Transportation utilities that ran along a road in Lawrenceville, Georgia. It involved a simple "tie-in" of the existing duct to a new duct and setting the new junction box. ComTran assigned a two-man crew for the project: Walter Cobb, the supervisor (or foreman) at the site, and Chris Jernigan, a helper who was "fairly new" at ComTran.

The crew broke ground on December 1, 2010. On the first day, Cobb used an excavator to dig a trench that was approximately four feet deep. He placed the "spoil pile" for the excavation at least two feet away from the edge of the trench, and he erected a silt fence between the pile and the excavation. There does not seem to be any dispute that this excavation was done properly and in compliance with OSHA.

---

[4] ComTran does not often (if ever) have to dig further than four feet because utility cables --- in contrast to water and sewer lines, for example --- are not typically installed more than 36 to 48 inches underground.

On the second morning of the job, ComTran's project manager Sam Arno stopped by to check on the progress. The crew had not yet started digging for the day, and there were no problems with (or hazard in) the trench at that time, so he left shortly thereafter to visit two other projects he was overseeing. Once Arno left, Cobb got into the trench and began digging around to find the utilities conduit, but he was unsuccessful. At some point, he took down the silt fence because he had to "dig back" to find the utilities. As he continued to dig, he widened and deepened the trench (to six feet) and the spoil came closer to the edge of the excavation. Eventually, it got to the point that Cobb had a five-feet high spoil pile at the edge of the excavation, which --- given its six feet depth --- created an eleven-feet high wall of earth that was not sloped, benched, or otherwise properly supported. Cobb was the only exposed employee in the trench.[5]

While Cobb was still in the trench, an OSHA compliance officer drove by and saw the spoil pile and only part of Cobb's head showing out of the top of the excavation. The officer called the local OSHA office, which then sent a different compliance officer, Caliestro Spencer, to investigate. When he arrived at the site, Spencer saw Cobb digging in the trench. He ordered Cobb out of the excavation and proceeded to photograph the scene, take measurements, and interview Cobb

---

[5] Jernigan was working at the road during this time and was apparently not involved in the excavation.

and Arno (who by that time had been called back to the site[6]). As a result of this inspection, the Secretary charged ComTran with two violations (and assessed penalties totaling $9,800.00) for Cobb's failure to avoid a potential cave-in hazard under 29 C.F.R. § 1926.651(j)(2) (excavated material must be kept at least two feet from the edge of an excavation) and § 1926.652(a)(1) (requiring sloping, benching, and adequate support systems to protect employees from possible cave-in hazards). ComTran timely contested the violations, both of which qualified as "serious." See 29 U.S.C. § 666(k) (defining a "serious violation" as one that carries "a substantial probability that death or serious physical harm could result").

## C. The Administrative Law Hearing and Decision

On July 18, 2011, an administrative hearing was held before the ALJ. The Secretary called one witness in support of her case: Compliance Officer Spencer. He testified about what he saw when he arrived at the Lawrenceville jobsite and about the substance of his interviews with the people at the scene. He testified that when he asked Cobb why he had failed to properly protect the trench, Cobb replied that he was just not paying attention to what he was doing.[7]

---

[6] Arno testified at the administrative hearing that when he returned to the jobsite during the investigation he was "taken aback" by how large the trench was. That size excavation was very unusual, not consistent with his instructions, not planned for, and not "[priced] into the job."

[7] This account was confirmed by Cobb, when he later testified (during ComTran's case) that he did not realize the trench had gone deeper than four feet because: "I just kept on digging. I had problems [finding the utilities] and was trying to get out of there, and really I didn't pay no

10

After the Secretary rested her case-in-chief, ComTran called five witnesses to testify, including --- in addition to Cobb and Arno --- Greg Bostwick (President of ComTran); Glen Sherwood (Vice President); and Phillip Clark (Vice President of Premise Cabling). These witnesses testified about the general type of work that ComTran performs and about the details of the Lawrenceville project. In addition, they testified about ComTran's safety program and the extent to which employees have been disciplined for violating safety standards.

The ALJ subsequently affirmed both citations by written order. After noting that it was undisputed that the Secretary had satisfied the first three elements of her prima facie case --- i.e., the applicability of the regulations, failure to comply with them, and employee exposure to the dangerous condition --- the ALJ went on to discuss the fourth and final element: employer knowledge. The ALJ began this portion of his analysis by holding that Cobb had knowledge of the violative conduct because "he himself had dug the excavation and placed the spoil pile at its edge." Relying on Commission precedent, the ALJ further held that since Cobb was a supervisor, his knowledge of his own malfeasances was imputable to

---

attention to it until OSHA come up and started asking me questions [about] how deep the hole is and about my spoil pile." He similarly testified on cross examination that "I didn't realize how deep I was until Spencer made me aware of the spoil pile." In fact, however, Cobb knew earlier that he was not following proper procedure. He acknowledged during the hearing --- in response to direct questioning by the ALJ --- that he was "not supposed to ever infringe on the silt fence", let alone "tear it down." Thus, while it may be true that Cobb got "lost in his work" while he was actually digging in the trench, he knew from at least the moment that he took down the fence that he was doing something he was not supposed to do.

11

ComTran. See Secretary of Labor v. Dover Elevator Co., Inc., 16 O.S.H. Cas. (BNA) 1281, at \*7 (1993) (stating that "when a supervisory employee has actual or constructive knowledge of the violative conditions, that knowledge is imputed to the employer, and the Secretary satisfies [her] burden of proof"). During his discussion of this issue, the ALJ noted that the Fifth Circuit has concluded that "a supervisor's knowledge of his own malfeasance is not imputable to the employer[.]" See W.G. Yates & Sons Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n, 459 F.3d 604, 608 (5th Cir. 2006) (emphasis original). However, as the ALJ further noted, the Sixth Circuit has held to the contrary. See Danis-Shook Joint Venture XXV v. Secretary of Labor, 319 F.3d 805, 811-12 (6th Cir. 2003). Insofar as the Eleventh Circuit had not yet weighed in and "directly addressed this issue", the ALJ held that the afore-cited Commission precedent applied. The ALJ then considered the unforeseeable employee misconduct defense, ultimately concluding that ComTran failed to establish the four elements under that defense. However, the ALJ reduced the penalty (from $9,800.00 to $5,000.00) because ComTran showed "good faith" by taking "decisive steps" to strengthen its safety program after the violations were discovered. The ALJ's order became a final decision when the Commission denied discretionary review, and ComTran now appeals.

## II. DISCUSSION

12

It is undisputed on appeal (as it was before the ALJ) that the Secretary has satisfied the first three elements of her prima facie case. The parties thus agree --- as do we --- that (1) the regulations applied; (2) Cobb did not comply with them; and (3) an employee was exposed to the hazardous condition. Consequently, our inquiry is narrowed down to (4) whether ComTran had knowledge.

Before turning to whether ComTran knew (or should have known) of the violations, it is important to make clear how the Secretary tried to establish it. As previously discussed, there are two ways that the Secretary can show knowledge. First, if the Secretary establishes that a supervisor had either actual or constructive knowledge of the violation, such knowledge is (in the typical case) imputed to the employer. Or, the Secretary can prove constructive employer knowledge based on the employer's inadequate safety program. During the administrative proceedings in this case, the Secretary made no effort to establish employer knowledge by the second method. She called only one witness during her case-in-chief, Compliance Officer Spencer, and he provided no evidence as to ComTran's safety program. It is thus clear --- and was acknowledged by the Secretary during oral argument, see Oral Argument at 23:25-25:17 --- that she sought to establish employer knowledge in this case solely by utilizing the first method.

We agree with the Secretary and the ALJ that Cobb had knowledge of his violative conduct. Notwithstanding his testimony that he was absorbed in his effort

to find the elusive utilities conduit and he just got "lost in his work", there is ample evidence that he at the very least <u>should</u> have known of the dangerous condition he put himself in. As indicated in note 7, <u>supra</u>, Cobb knew that was "not supposed to ever infringe on the silt fence", and yet he tore it down and proceeded to extend the excavation until he was standing in the shadow of an 11-foot wall of earth. Photos of the trench that were introduced during the administrative hearing and made part of the record on appeal belie any claim that he did not realize the dangerousness of the situation. It was manifest. We thus have little difficulty holding that Cobb knew (or reasonably should have known) of his misconduct.

Cobb's knowledge of his own violative conduct does not resolve this case, however. As explained at the outset of this opinion, the question we are called on to decide is whether it is appropriate to impute, as here, a supervising employee's knowledge of his own malfeasance to his employer under OSHA. While this is an issue of first impression in this circuit, we do not write on a blank slate. The issue has already been considered and decided by at least five of our sister circuits.

The Fourth Circuit appears to have been the first appellate court to consider this issue in <u>Ocean Electric Corp. v. Secretary of Labor</u>, 594 F.2d 396 (4th Cir. 1979). That case involved an experienced electrical contractor foreman who opened the door to a switch gear unit (in order to remove an unenergized ground bus bar) and left it open, which led to the electrocution and death of an apprentice

14

electrician. It was stipulated and agreed by the parties that leaving the door open was an accident and purely a human error. Nevertheless, his employer, Ocean Electric Corporation, was cited for a serious violation under the Act. Applying the common law doctrine of respondeat superior, the ALJ upheld the citation because Ocean was responsible for its foreman's negligence. The Commission affirmed the ALJ's ruling, but for a different reason. It concluded that although OSHA does not hold employers strictly liable for the negligent acts of their supervisors, liability can be avoided only if the employer has tried to do "everything reasonably possible to assure compliance[.]" The Commission rejected this defense, however, because Ocean "had not carried its burden of proof by showing the adequacy of its safety program." See generally id. at 397-98.

The Fourth Circuit reversed. It began by observing that employers could not escape "all responsibility" for the negligence of its supervisors because, of course, a corporation "can only act through its agents and to excuse Ocean simply because its foreman was negligent would emasculate the Act." See 594 F.2d at 399. On the other hand, however, "an imputation of a supervisor's acts to the company in each instance would frustrate the goals behind the Act." See id. After analyzing the law (both Commission precedent and circuit case law) in depth, see id. at 399-401, the Court summed up the law this way: "[I]f a violation by an employee is reasonably foreseeable, the company may be held responsible. But, if the employee's act is an

15

isolated incident of unforeseeable or idiosyncratic behavior, then common sense and the purposes behind the Act require that a citation be set aside." See id. at 401. The Fourth Circuit held that it is the Secretary's burden to prove that the violation should have been "reasonably foreseeable" by the employer --- as opposed to an "isolated incident of unforeseeable or idiosyncratic behavior" by an employee --- and that it was error for the Commission to shift the burden onto Ocean. See id. at 401; accord id. (stating that "no part" of the Secretary's prima facie burden can be "left to speculation or conjecture", and that an employee's "isolated violation of a standard" that is both unknown to the employer and contrary to its orders does not constitute a violation of OSHA's "special duty" clause) (citation omitted). During its discussion of the Secretary's burden, the Court cited a procedural rule, which (although rescinded years later, in 1986) provided at the time: "'In all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary.'" See id. at 401-02 (quoting 29 C.F.R. § 2200.73(a)).

Thereafter, the Tenth Circuit addressed this issue in Mountain States Telephone & Telegraph Co. v. Occupational Safety & Health Review Comm'n, 623 F.2d 155 (10th Cir. 1980). That case involved a two-man utilities crew that was sent out by their employer, Mountain States, to perform telephone utilities work. One of the men of the crew, Howard Halverson, was an experienced subforeman --- the supervisor on the job --- and the second employee was an

16

inexperienced first year apprentice. While on the job, Halverson violated OSHA standards by not wearing rubber gloves as he worked on live wires, which resulted in his electrocution and death. The employer was cited under the Act, and the Commission affirmed the citation on the ground that "Mountain States failed to show Halverson's violation of the standard was unpreventable because it did not show the enforcement of its safety program was adequate." See id. at 157. On appeal, the Tenth Circuit stated:

> Commission rule 73(a), 29 C.F.R. s 2200.73(a), provides that "(i)n all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary." Reasonably construed, this rule requires the Secretary to prove the elements of a violation. See Brennan v. OSHRC, 511 F.2d 1139 (9th Cir. 1975). The question we decide here is whether the Commission erred when it placed upon Mountain States the burden of proving the violation was unpreventable. The Fourth Circuit, in reviewing a Commission decision involving circumstances similar to those here, held the Commission may not place the burden on the employer. Ocean Elec. Corp. v. Secretary of Labor, 594 F.2d 396 (4th Cir. 1979) [additional citations omitted] . . . We agree with the result reached by the Fourth Circuit.

Id. at 157-58. The Court specifically rejected the suggestion that "the Secretary's burden of showing the employer's knowledge was met by proof that Halverson had some supervisory responsibilities and that Halverson knew his own failure to wear rubber gloves was a violation." Id. at 158. Although the Court acknowledged that a corporate employer can only act and acquire knowledge through agents, and, thus,

17

ordinarily the acts and knowledge of supervisory employees are correctly imputed to their employer, the situation is "different" when the supervisory employee is the actual malfeasant:

> When a corporate employer entrusts to a supervisory employee its duty to assure employee compliance with safety standards, it is reasonable to charge the employer with the supervisor's knowledge actual or constructive of noncomplying conduct of a subordinate. Upon a showing of the supervisor's knowledge, it is not unreasonable to require the employer to defend by showing the failure to prevent violations by subordinates was unforeseeable. But when the noncomplying behavior is the supervisor's own a different situation is presented. Halverson knew he personally violated the safety standards, of course; if we impute that knowledge to the employer and declare that now the employer must show the noncomplying conduct was unforeseeable we are shifting the burden of proof to the employer. All the Secretary would have to show is the violation; the employer then would carry the burden of nonpersuasion.

Id. at 158. Because the Commission made its findings in light of an "erroneously allocated" burden of proof, the matter was remanded for reconsideration. See id.

The Third Circuit is in agreement on this issue. In Pennsylvania Power & Light Co. v. Occupational Safety & Health Review Comm'n, 737 F.2d 350 (3d Cir. 1984), the crew-leader of a three-man utilities crew, Willard Hankee, failed to comply with an OSHA standard, and it led to injury and death. The ALJ found that the Secretary established her prima facie case that the employer PP&L knew of the violation by merely showing "that one of PP&L's supervisory employees, Hankee

18

himself, was aware of the violative conduct." Id. at 355. The ALJ then shifted the burden to the employer to rebut this inference by demonstrating "'that it had done everything reasonably possible to avoid a violation.'" See id. After noting that the Secretary has the burden of proof with respect to every element of her prima facie case, see id. at 357 (citing 29 C.F.R. § 2200.73(a)), and after noting the "prevailing view among the circuits [that] . . . the employer's knowledge or ability to discover a violation is an element of the Secretary's case-in-chief," see id., the Third Circuit reversed and held "the Secretary may not shift to the employer the ultimate risk of non-persuasion in a case where the inference of employer knowledge is raised only by proof of a supervisor's misconduct." Id. at 358. The Court did not "quarrel with the logic" of imputing knowledge where the supervisor knows of violative conduct by other employees; however, like the Fourth and Tenth Circuits before, the Third Circuit determined that a different situation is presented when the supervisor is the one personally engaged in the misconduct. See id. at 357-58 & n.9.

The Secretary here makes several arguments why Ocean Electric, Mountain States, and Pennsylvania Power & Light should not be followed in this circuit. For example, she points out that all three cases cited a former Commission procedural rule which, as earlier noted, was rescinded in 1986 but which provided at the time: "In all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary." 29 C.F.R. § 2200.73(a). However, the fact that

19

the rule was rescinded has no bearing on the continued viability of those cases. The rule was not rescinded because the Secretary no longer has the burden to prove her prima facie case --- she obviously does. It was rescinded only because experience showed that its "unequivocal wording . . . misled pro se employers and sometimes even attorneys into believing that they never bore a burden of proof" when, in fact, "the employer bears the burden of proof on affirmative defenses." See generally 51 Fed. Reg. 32,002, 32,012 (Sept. 8, 1986). However, the employer bears the burden on affirmative defenses only if the Secretary proves a prima facie case first. See New York State Elec. & Gas Corp., 88 F.3d at 108 ("The Secretary must first make out a prima facie case before the affirmative defense comes into play"). In other words, even without Commission Rule 2200.73(a) in effect, the Secretary still has the burden to prove her prima facie case, and the rescission of this rule in 1986 did not invalidate the ultimate holdings of Ocean Electric, Mountain States, or Pennsylvania Power & Light.

The Secretary suggests that these cases not be followed for another reason: they were decided a long time ago.[8] Judicial decisions, however, are not spoilable like milk. They do not have an expiration date and go bad merely with passage of

---

[8] The Secretary asserted during oral argument that the cases were decided shortly after Congress passed OSHA in 1970, when the state of the law in this area was "murky", "unclear", and akin to "the Wild West." See Oral Argument at 9:20-9:26; 11:42-12:10. In fact, the first of these cases, Ocean Electric, was decided in 1979, almost a decade after OSHA. Mountain States was decided the following year, and Pennsylvania Power & Light was decided in 1984, 14 years after OSHA became law.

time. These cases have not been overruled, and, in fact, they have each been cited (relatively recently) with approval in their respective circuits. See L.R. Willson & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 134 F.3d 1235, 1240-41 (4th Cir. 1998) (relying heavily on Ocean Electric and concluding that its reasoning "is consistent with the clear intent of the Act"); Department of Labor v. Occupational Safety & Health Review Comm'n, 938 F.2d 1116, 1117 (10th Cir. 1991) (citing Mountain States for the proposition that the Secretary has the burden to prove the employer knew of the violation); Blue Ridge Erectors v. Occupational Safety & Health Review Comm'n (No. 06-2475, Jan. 17, 2008, 3d Cir.) (relying on Pennsylvania Power & Light for the proposition that the Secretary must prove the misconduct was foreseeable and, therefore, preventable) (unpublished opinion).

Not only do the Ocean Electric, Mountain States, and Pennsylvania Power & Light decisions have continued viability in their circuits, but they have been cited with approval in other circuits as well, including the Fifth Circuit in W.G. Yates & Sons Construction Co., Inc., 459 F.3d at 604, a case (from 2006) that involved a by now familiar fact pattern.

W.G. Yates & Sons was the subcontractor on a construction job. On the day at issue, it assigned a three-man crew for the project, one of whom, Martin Olvera, served as foreman. OSHA compliance officers stopped by the jobsite and observed Olvera working along a dangerous ledge without any fall protection, in violation of

21

OSHA standards. The employer was thereafter cited for a serious violation and the ALJ upheld the citation. In concluding that the Secretary had established her prima facie case --- in particular, the employer knowledge element --- the ALJ stated that: "The Respondent had knowledge of this violation. It knew, or with the exercise of reasonable diligence could have known, of the violative condition. Mr. Olvera, the Respondent's foreman, knew that he was working on this slope, exposed to a 65-foot fall with no fall protection. His knowledge of this condition, as a foreman of the three-man Yates crew, is imputed to the Respondent." Secretary of Labor v. W.G. Yates & Sons Constr. Co., Inc., 21 O.S.H. Cas. (BNA) 1171, at *3 (2005). The ALJ then proceeded to consider and reject the unforeseeable employee misconduct affirmative defense, after noting that the defense would be difficult to prove in that case because Olvera was a supervisory employee and the fact that he engaged in the violative conduct "is strong evidence that Yates' safety program is lax." Id. at *6.

The employer appealed, and the Fifth Circuit described the issue on appeal as "when is it appropriate (or inappropriate) to impute the supervisor's knowledge of his own misconduct to the employer." 459 F.3d at 607. The Court observed that the issue had already been considered in other circuits, see generally id. at 606-08 (citing Ocean Electric, Mountain States, and Pennsylvania Power & Light), but the question had not been "directly answered" in the Fifth Circuit. See id. at 608. After

22

citing the Fourth, Tenth, and Third Circuit cases --- and a 1976 former Fifth Circuit

case, Horne Plumbing & Heating Co., 528 F.2d at 564 (which was not squarely on

point, but which was "instructive"), the Court, in a split decision, reversed the ALJ

and stated as follows:

> Yates can be charged with knowledge only if Olvera's knowledge of his own misconduct is imputable to Yates. The knowledge is imputed only if Olvera's conduct was foreseeable. Consequently, the Secretary, not Yates, bears the burden to establish that the supervisor's violative conduct was foreseeable. Yet, the ALJ charged Yates with knowledge of Olvera's misconduct without any inquiry as to whether the misconduct should have been foreseen by Yates. Finding the Secretary had established a serious violation (based only on Olvera's misconduct), the ALJ then shifted the burden to Yates to establish the defense of employee misconduct. By failing to conduct the foreseeability analysis before imputing Olvera's knowledge, the ALJ effectively relieved the government of its burden of proof to establish a violation of the Act and placed on Yates the burden of defending a violation that had not been established.

> * * *

> The failure of the ALJ correctly to assign the burdens of proof requires us to remand this case to allow the respondent to conduct a forseeability analysis to determine whether the knowledge of Olvera can be imputed to Yates.

Id. at 609-10 (emphasis original; footnote omitted).

Against these decisions out of the Fourth, Tenth, Third, and Fifth Circuits is

a decision from the Sixth Circuit, Danis-Shook Joint Venture XXV v. Secretary of

23

Labor, 319 F.3d at 805. This case arose out of an accident in which a foreman, who was working in a water treatment facility basin without protective equipment (such as a harness, lifeline, or buoyant vest), was pulled down into a drain and drowned. His employer, Danis-Shook, was cited for several OSHA violations, and the ALJ upheld the citations, in part, as did the Commission. The employer appealed to the Sixth Circuit, where the question was "whether Danis-Shook had knowledge of the violation." See id. at 811. With relatively little analysis of the issue, the Court held that "knowledge of a supervisor may be imputed to the employer. Because Wagner was a foreman and knew of his own failure to wear personal protective equipment, this failure may be imputed to Danis-Shook." See id. at 812 (citations omitted). The Sixth Circuit did not draw a distinction, as the other circuits have, between a supervisor's knowledge of misconduct by subordinate employees and knowledge of his own misconduct.

After review of these cases from our sister circuits, we are persuaded by the reasoning of the Fourth, Tenth, Third, and Fifth Circuits, and we adopt their legal analyses and conclusions to the extent as described and set forth above.[9] We hold

---

[9] There is a part of the W.G. Yates & Sons Construction Company decision that was not "described and set forth above" which we have some concerns about. Specifically, in the course of its analysis, the Fifth Circuit appeared to suggest that imputing knowledge when a supervisor is the malfeasant would be tantamount to the imposition of strict liability. See 459 F.3d at 607-08. As the dissent pointed out in that case, however, see id. at 610 (Reavley, J., dissenting), and as the Secretary has maintained in our case, that is inaccurate. Even if knowledge were imputed to the employer in that situation, it would not end the inquiry as the employer would still be able to raise the unforeseeable employee misconduct affirmative defense. Thus, imputing knowledge

24

that the Secretary does not carry her burden and establish a prima facie case with respect to employer knowledge merely by demonstrating that a supervisor engaged in misconduct. A supervisor's "rogue conduct" cannot be imputed to the employer in that situation. Rather, "employer knowledge must be established, not vicariously through the violator's knowledge, but by either the employer's actual knowledge, or by its constructive knowledge based on the fact that the employer could, under the circumstances of the case, foresee the unsafe conduct of the supervisor [that is, with evidence of lax safety standards]." W.G. Yates & Sons Constr. Co., Inc., 459 F.3d at 609 n.8. Without such evidence, a supervisor's misconduct may be viewed as an isolated incident of unforeseeable or idiosyncratic behavior, see Ocean Elec. Corp., 594 F.2d at 401, which is insufficient, by itself, to impose liability under the Act. See W.G. Yates & Sons Constr. Co., Inc., 459 F.3d at 607 ("'the purposes of the Act are best served by limiting citations for serious violations to conduct that could have been foreseen and prevented by employers with the exercise of reasonable diligence and care'") (citation omitted); Pennsylvania Power & Light Co., 737 F.2d at 354 (OSHA does not impose liability on employers "for isolated and idiosyncratic instances of employee misconduct"); see also Horne Plumbing & Heating Co., 528 F.2d at 571 ("unforeseeable, implausible" employee misconduct

---

from the malfeasant supervisor would not be strict liability. It would, however, prematurely and improperly shift the burden to the employer. To that extent, we agree with the Fifth Circuit and the other circuits that have held similarly.

25

is not imputable to employer).[10] Contrary to the Secretary's contention in her brief and during oral argument, there is, in fact, a "reasoned basis" to draw a distinction between a supervisor's knowledge of a subordinate's misconduct (which everyone agrees is imputable to the employer) and knowledge of his own misconduct (which the clear majority of circuits have held is not).

"When a corporate employer entrusts to a supervisory employee its duty to assure employee compliance with safety standards, it is reasonable to charge the employer with the supervisor's knowledge actual or constructive of noncomplying conduct of a subordinate." Mountain States, 623 F.2d at 158. It is reasonable to do this because a corporate employer can, of course, only act through its agents --- as several of the above-cited cases have recognized --- and the supervisor acts as the "eyes and ears" of the absent employer. That makes his knowledge the employer's knowledge. However, "a different situation is presented" when the misconduct is the supervisor's own. Id. In that situation, the employer has no "eyes and ears." It is, figuratively speaking, blind and deaf.[11] To impute knowledge in this situation

---

[10] "Idiosyncratic", "isolated", "unforeseeable", and "implausible" appear to be accurate descriptions of Cobb's behavior in this case. He was an experienced supervisor with, insofar as the record is developed, no history of any OSHA violations, let alone "serious" ones. In fact, Greg Bostwick, the President of ComTran, testified at the hearing that when he first heard about what happened he "couldn't believe it" and thought there must be "something more to the story" as Cobb had attended "more trench safety classes than any employee in our company. He could teach them."

[11] That is especially so in a case like this one, where the supervisor was focused intently on a specific task; he was not paying close attention; he arguably did not know of the dangerous condition (notwithstanding that he should have known); and there was nobody there to observe

would be fundamentally unfair. Cf. Horne Plumbing & Heating Co., 528 F.2d at 570 ("'Fundamental fairness would require that one charged with and penalized for [a] violation be shown to have caused, or at least to have knowingly acquiesced in, that violation. Under our legal system, to date at least, no man is held accountable, or subject to fine, for the totally independent act of another[.]'") (quoting Brennan, 511 F.2d at 1145).

Thus, as the Second Circuit has noted, these circuit decisions are ultimately "bottomed" on fairness. See New York State Elec. & Gas Corp., 88 F.3d at 107 (discussing Pennsylvania Power & Light and Mountain States). Specifically, if the Secretary is permitted to establish employer knowledge solely with proof of the supervisor's misconduct --- notwithstanding that the employer did not know, and could not have known, of that misconduct --- then the Secretary would not really have to establish knowledge at all. The mere fact of the violation itself (element 2) would satisfy the knowledge prong (element 4). This is because, in the "special situation" where the violative conduct belongs to a supervisor, "the usual rule that a supervisor's knowledge is imputed to the employer would make the knowledge

---

(and warn) him. This is not the situation where a supervisor was being intentionally careless and watched by others. Cf. Horne Plumbing & Heating Co. v. Occupational Safety & Health Review Comm'n, 528 F.2d 564, 566 n.1 (5th Cir. 1976) (noting the "rather cavalier attitude" on the part of a malfeasant foreman who was specifically warned of the dangerous condition by a subordinate employee watching nearby, yet he disregarded the warnings and, in fact, joked that he "wouldn't have to worry . . . if (he) was all right with God"). Cobb was digging in the trench by himself and got lost in his work. It is difficult to see how ComTran even arguably had "eyes and ears" at the Lawrenceville project at that time.

27

requirement easy to prove [because] the non-complying supervisor obviously knew of his or her own conduct." Id. In other words, where a supervisor is the malfeasant, the Secretary would only have to meet three of the four elements of her prima facie case. She would not have to prove employer knowledge because that element would be subsumed within the violation prong. See Mountain States, 623 F.2d at 158 ("[The supervisor] knew he personally violated the safety standards, of course; if we impute that knowledge to the employer and declare that now the employer must show the noncomplying conduct was unforeseeable we are shifting the burden of proof to the employer. All the Secretary would have to show is the violation; the employer would then carry the burden of nonpersuasion."). We agree with the circuits that have held this result would be arbitrary, capricious, and not in accordance with the law.

In sum, we hold that if the Secretary seeks to establish that an employer had knowledge of misconduct by a supervisor, she must do more than merely point to the misconduct itself. To meet her prima facie burden, she must put forth evidence independent of the misconduct. This could be done, for example, with evidence of lax safety standards. But, the Secretary is the one who must provide such evidence.

The Secretary contends, however, that even if the Commission erroneously imputed Cobb's knowledge of his own malfeasance to ComTran, thus improperly shifting the burden of proof on her prima facie case, the record viewed as a whole

28

shows that the error was harmless. She maintains that because ComTran's safety program was "patently inadequate", the company had constructive knowledge of the violative conduct. We disagree. While ComTran presented <u>some</u> evidence on the issue during its case --- and the ALJ found that evidence insufficient to support the unpreventable employee misconduct affirmative defense --- in the absence of the Secretary making her prima facie case, ComTran was not obligated to present <u>any</u> evidence on the adequacy of its safety program. <u>See</u> <u>New York State Elec. & Gas Corp.</u>, 88 F.3d at 107-08. ComTran insists, and we agree, that it was in fact harmed by the Commission's failure to properly allocate the burden of proof. Had the Secretary been required to carry her prima facie burden by attempting to show employer knowledge (which, on the facts presented here, and as discussed above, should have been through a showing of lax safety standards), then ComTran might have been able to more effectively rebut the Secretary's offer of proof with <u>specific</u> evidence in direct response to the alleged inadequacies.[12] As it was, ComTran had to guess what particular evidence might have been sufficient to rebut the Secretary and establish the adequacy of its safety program. This was not harmless error. The case must be remanded to the Commission for further development of the record.

### III. CONCLUSION

---

[12] ComTran asserts that it did not present all the evidence that it could have on the issue of its safety program. It appears that it may have been reluctant to do so out of fear that it might "offer proof against itself that it need not have introduced at all [since] . . . the Secretary fail[ed] to introduce any evidence of the Employer's safety program --- inadequate or otherwise."

For the reasons stated above and in the decisions by the Fourth, Tenth, Third, and Fifth Circuits, we conclude that the Commission acted arbitrarily, capriciously, and otherwise not in accordance with the law when it relieved the Secretary of her burden to prove the essential "knowledge" element of her prima facie case and prematurely shifted the burden to ComTran. As this error was not harmless, the petition for review is GRANTED, and the Commission's decision is REVERSED. The case is remanded to the Commission for proceedings consistent with this opinion.

**REVERSED AND REMANDED**